UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CAROL A. IVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:11-cv-083-JD |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Carol A. Ivey seeks judicial review of the final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her application for Title II Disability Insurance Benefits (DIB) and Title XVI Supplemental

Security Income (SSI) under the Social Security Act, 42 U.S.C. §§ 423, 1382.[1]

## I. ADMINISTRATIVE HISTORY

Plaintiff, Carol Ann Ivey, initiated a claim for DIB and SSI on February 6, 2008 [TR

126-28, 132-34], alleging an amended disability onset date of February 2, 2005 [TR 13, 142,

185]. The claim was initially denied on June 30, 2008, and again denied upon reconsideration

on August 13, 2008 [TR 73-87]. On January 8, 2010, a video hearing was held with Ivey and her

attorney appearing in Gary, Indiana and the Administrative Law Judge, Michael Hellman,

appearing in Orland Park, Illinois [TR 29-70]. During the hearing, Ivey testified [TR 37-27], as

---

[1]The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

did Vocational Expert Grace Gianforte (VE) [TR 27-69].

At step one of the sequential evaluation, the Administrative Law Judge (ALJ) found that Ivey had not engaged in substantial gainful employment since February 2, 2005, and that she remained insured through December 31, 2010 [TR 15].   At step two, the ALJ found that Ivey suffers from severe impairments, including degenerative disc disease with a small L5-S1 disc herniation, peripheral vascular disease, hypertension, chronic obstructive pulmonary disease, mild osteoarthritis of the left hip, and obesity [TR 15]; however, at step three she does not meet or equal any listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1 (referred to as listings) [TR 15-16].  The ALJ then concluded that Ivey has the residual functional capacity (RFC)[2] to perform light work,[3] except that she can never crawl or climb ladders, ropes or scaffolds; can only occasionally balance, stoop, crouch, kneel, or climb ramps or stairs; should avoid concentrated exposure to extreme temperatures, wetness or humidity, or pulmonary irritants, such as fumes, odors, dusts, and gases [TR 16].  At step four, the ALJ concluded that Ivey is able to perform her past relevant work as a lock repairer as generally performed in the national economy, and therefore she is not disabled as defined by the Social Security Act [TR 22].

---

[2]Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

[3]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, then he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II.  FACTS

At the time of the ALJ's decision, Ivey was fifty-seven years old, she was approximately five-foot, seven inches tall, and she weighed two hundred and fifty-five pounds [TR 37].  Ivey has a tenth grade education level [TR 190], has not worked since August 20, 2004, and prior to that time she worked for twenty-seven years as a Return Goods Technician for a lock company [TR 185-86, 195].  Specifically, Ivey worked only with padlocks, she was not a locksmith [TR 59], and her job required her to use pliers and screwdrivers [TR 61, 195], but she stopped working because the plant where she worked shut down [TR 39-40].  Ivey's relevant medical record is as follows:

### A.    Medical Record

 Ivey's medical history includes records from her treating physician, Jerome March, D.O.  The records from Dr. March demonstrate treatments and examinations for numerous conditions including: lower back, leg, hip, and knee pain, restless leg syndrome, claudication, lower extremity tingling and numbness, stiffness in both hands, obesity, hypertension, chronic obstructive pulmonary disease, arthritis, balance problems and dizziness, fatigue and difficulty sleeping, arm and shoulder pain, sinus problems and headaches and gastrointestinal issues [TR 303-20, 509-13, 606-15].

In March 2005, Dr. March referred Ivey to specialist Vijay Gupta, M.D. for Ivey's chief complaint of pain in her lower back radiating to her right leg which she had experienced for about one year [TR 246, 357].  During the examination, Dr. Gupta noted that Ivey stated that about one year prior she had felt this pain at work, and since then, the pain had increased in intensity and had become intolerable and conservative treatments did not help [TR 246].  Dr.

Gupta reviewed the lumbar spine magnetic resonance imaging (MRI) results, and it showed degenerative disc disease and a small herniated disc at L5-S1; thus, he recommended a lumbar epidural steroid injection [TR 246].  Ivey scheduled the epidural, which resulted in complete pain relief for two or three days, but the pain returned [TR 243-44, 364].  On March 22, 2005, Dr. Gupta recommended that she have a transforaminal epidural steroid injection, but Ivey did not know if her new insurance would cover the procedure, so Dr. Gupta recommended that she take Darvocet-N 100 [TR 243].

On April 5, 2005, Ivey went to see Dr. Gupta for a followup, and she reported that the Darvocet was keeping her almost pain free and she denied any side effects or problems from the injection or the medication [TR 367].  She was instructed to continue taking one tablet at bedtime and one tablet in the daytime, and to followup in four weeks. *Id*.

By May 2005, Ivey was back in Dr. Gupta's office complaining that the pain had completely returned and that the pain medication, Darvocet, was not helping much, except for a very little time [TR 241].  Dr. March recommended that she consult a neuro/back surgeon and if that did not work, then Ivey would have to control her pain with stronger narcotic medications [TR 241].

After complaining of pain in her lower back and both ankles, knees, and legs in early February 2006, an arterial Doppler study of the Ivey's knees indicated mild arterial insufficiency of Ivey's lower extremities [TR 349-60, 427-28].  X-rays were taken of her ankles but demonstrated no fracture, dislocation, or suspicious foreign body, however, a small plantar calcaeal spur was noted on each ankle. *Id*.  An MRI of her lumbosacral spine indicated a disk desiccation at L5-S1, and the impression was that she had mild degenerative disease at L5-S1

4

with very small central disk herniation. *Id*.

On referral from Dr. March, Ivey saw U.H. Patel M.D. for the lumps on her left ankle [TR 346]. She was advised to use cortisone cream for a week and to protect the area. *Id*. She eventually had the lesion removed [TR 257, 260, 263].

On March 21, 2006, Ramesh Kanuru, M.D., examined Ivey on referral from Dr. March in response to complaints of continued lower back pain radiating bilaterally to her lower extremities [TR 252-54]. Ivey indicated her pain began about two years prior and she was prescribed Vicodin by Dr. March. *Id*. She graded her pain level at 8 out of 10 (0 indicating no pain and 10 indicating severe pain), and reported difficulty sleeping due to pain. *Id*. On examination, Ivey had back pain with her range of motion testing, lumbar tenderness and pain, and a positive Patrick's sign indicative of hip arthritis on both the right and left side [TR 253]. Dr. Kanuru noted that Ivey had no difficulty walking to the examination table and her gait was normal, and that Ivey was able to walk on her heels and toes [TR 253]. Dr. Kanuru also noted that Ivey denied having shortness of breath, yet she had a history of emphysema, and that she denied having a history of arthritis [TR 252]. Dr. Kanuru diagnosed Ivey with a herniated lumbar disc, bilateral lumbar radiculitis, and degenerative lumbar disc disease and noted that Ivey should take Zanaflex at bedtime and try physical therapy prior to a lumbar injection [TR 254].

In December 2006, Ivey complained of left hip pain [TR 341], and a left hip x-ray showed Ivey had mild arthropathy, but no evidence of a fracture or soft tissue swelling [TR 340].

In May 2007, Ivey complained of abdominal pain to Dr. March, and was then treated by Wail Asfour, M.D. for bladder problems [TR 332, 338]. Testing showed gallstones [TR 337].

Also in May 2007, an arterial duplex study revealed moderate peripheral artery disease involving the right lower extremity and moderate to severe disease involving the left lower extremity [TR 332]. In June 2007, Prakash Makam, M.D. noted that Ivey is a young white female who has disabling claudication in both legs [TR 333]. He noted that she can barely walk half a block without getting calf claudication [TR 333]. Dr. Makam then scheduled Ivey for an angiogram and possible leg intervention [TR 333].

On June 19, 2007, Ivey's chief complaint was constant leg pain, and Dr. Makam performed an abdominal angiogram, a bilateral renal artery digital subtraction angiogram, and an abdominal angiogram with runoff [TR 290, 293]. Dr. Makam concluded that Ivey had mild peripheral vascular disease and severe claudication in both legs [TR 293-94].

On February 10, 2008, Ivey was treated in the emergency room for abdominal pain [TR 409-16]. From February 17 to 19, 2008, Ivey was hospitalized for severe abdominal pain [TR 443, 380-416]. Ivey was found to have chronic cholecystitis with acute exacerbation and likely acute calculus cholecystitis, along with suffering from hypertension, restless leg syndrome, and a hital hernia [TR 327, 548]. Ivey underwent a laparoscopic cholecystectomy and cholangiography [TR 321].

In March 2008, Ivey experienced elbow pain and hand numbness and nerve conduction studies indicated mild left carpal tunnel syndrome in Ivey's left hand and lateral epicondylitis bilaterally [TR 530]. A lumbar spine MRI showed degenerative disc disease and a disc herniation at L5-S1, and a mild indentation of the thecal sac [TR 537-38]. A computerized tomography (CT) of Ivey's lumbar spine also revealed a shallow central nuclear protrusion at L5-S1 without evidence of spinal stenosis [TR 461].

On April 10, 2008, Ivey was evaluated by Dr. Marc Levin, M.D., at which time she complained of constant low back pain radiating into both of her lower extremities [TR 525]. She reported that she had these symptoms for at least three and a half years, and had no relief with physical therapy and epidural injections [TR 525]. Her symptoms are aggravated by virtually anything she does [TR 525]. Dr. Levin reported that she had a diminished range of motion and a disc degeneration at L5, and believed that her symptoms were secondary to degenerative disc disease [TR 525]. On April 17, 2008, Ivey had surgery performed including a lumbar provocative manometric diskography at L3-4, L4-5 and L5-S1, with fluoroscopic guidance, and her postoperative diagnosis consisted of degenerative disc at L5-S1, disogenic pain at L5-S1, and discordant pain and mild degenerative disc at L3-4 [TR 456]. A CT of her lumbar spine indicated shallow central nuclear protrusion at L5-S1 without spinal stenosis [TR 461].

On May 7, 2008, Teofilo Bautista, M.D., examined Ivey at the request of the state agency to assess her disability claim based on emphysema, arthritis in the hips, herniated discs and leg pain, and ultimately, Dr. Bautista concluded that she presented with a history of emphysema, degenerative joint disease of the left hip with pain and tenderness in the anterior hip area, degenerative joint disease of the right knee, mild peripheral vascular disease, chronic low back pain with degenerative disc disease and a herniated disc at the L5-S1 level, bilateral lumbar radiculitis, hypertension, and obesity [TR 471-74, 600-03]. Ivey reported that she became short of breath after walking half a block, climbing four step, and lifting ten pounds, and that she could not stand beyond twenty minutes, needed to rest between household chores, and had difficulty shopping but was independent with her activities of daily living [TR 600]. Dr. Bautista noted that Ivey limped due to knee pain, walked with no assistive device, and had chronic low back

7

pain which has been progressive for the past two years [TR 600]. He also noted that lumbar epidural steroid injections afforded only temporary relief, but daily use of Motrin 800 provided good relief [TR 600]. Ivey refused and was unable to do a range of motion exam of the back or hips due to the pain at the lumbosacral [TR 600]. Ivey also could not do tandem, heel and toe walking due to her right knee pain and tendency to lose her balance [TR 600]. Dr. Bautista noted that Ivey had a good range of motion in both wrists and shoulders, had good upper extremity strength, good grip strength, and she was able to button and pickup coins [TR 602].

Ivey underwent pulmonary function testing in June 2008 with post-bronchodilator best efforts resulting in a forced vital capacity (FVC) value of 2.01, a forced expiratory volume (FEV) value of 1.40, and an FEV/FVC ration of 70% [TR 560]. Right knee x-rays in June 2008 showed minimal lateral subluxation, which is a partial dislocation of the patella, and thickening of the fibular neck [TR 566]. A left hip x-ray showed narrowing of the joint space [TR 567].

On June 11, 2008, Ivey complained of low back pain radiating to both lower extremities, and she underwent an anterior lumbar fusion at L5-S1 [TR 480, 484]. Notes indicated that Ivey had no edema in her extremities, but displayed a diminished range of motion in the lumbosacral spine [TR 484-85]. Ivey also noted that she suffered from the symptoms for three and one-half years, that conservative measures including physical therapy and epidural steroid injections were without relief, and her symptoms were aggravated by virtually anything she does [TR 484]. The surgery was followed up by recommended physical therapy [TR 481]. At a two week post lumbar fusion followup, Ivey reported that she was still tired but overall feeling much better and walking good since the surgery, that her legs no longer ached and she was not experiencing any numbness, tingling, or weakness, but had an occasional ache in her low back and buttocks [TR

8

645].  She was taking Norco once per day. *Id*.

On June 27, 2008, Richard Wenzler, M.D., a non-examining physician for the state agency reviewed the record for the state agency and concluded that Ivey could perform light work that included: occasional postural activities but never crawling or balancing; unlimited manipulative ability (reaching, handling, fingering, and feeling); unlimited visual ability; unlimited hearing and speaking abilities; and no concentrated exposure to extreme heat or cold, humidity, or fumes, dust, gases, or odors [TR 572-79].  Dr. Wenzler noted that Ivey can occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about six hours in an eight hour workday, that she could sit six hours in an 8-hour workday, and that Ivey's ability to push or pull, including operation of hand and/or food controls was unlimited [TR 573].  Dr. Wenzler noted that Ivey had a herniated disc in her back, had a right knee subluxation of the patella and hip narrowing of joint space, and noted that Ivey was independent in carrying out her activities of daily living, was not on narcotic pain medication, and had no current pain clinic visits and therefore he found Ivey to be only partially credible relative to her limitations [TR 573-74, 577].

Physical therapy notes from July 2008 indicated that Ivey could sit for 15 minutes, stand for 5-10 minutes, and walk one-half block [TR 582].  The physical therapist discussed with Ivey the importance of rest periods and at one point needed to reinforce the importance of rest, and her pain was reported as ranging from 1-8 out of 10 during July [581-90].  She was discharged from therapy on July 28, and reported that her pain was a 3 out of 10, and she could sit for 10 minutes, stand for 15-20 minutes in one place, and walk around for 15 minutes [TR 596-97].

In August 2008, Ivey complained of a lot of pain in her hands, legs, and back, and

indicated that she could only lift 10 pounds and that her hands get stiff after 20 minutes, and she can only walk one-half block and sit 20 minutes [TR 215].

In September 2008, Ivey had a followup exam (approximately four months after her anterior lumbar interbody fusion at L5-S1 on June 11, 2008), and Ivey reported that she was 75% better, has no leg pain, no significant lower back pain, and no numbness or tingling [TR 644]. However, Ivey did state that she had some mild stiffness and achiness in her lower back, but overall she was very happy with her results and was doing much better after her surgery [TR 644].

Later in September 2008, Ivey saw Kevin Joyce, D.O.  Ivey reported multiple joint pains [TR 650-52].  Ivey indicated experiencing pain in her hands, knees, left hip, and right ankle, and she reported that Tylenol and Ibuprofen has not worked [TR 650-52].  Dr. Joyce indicated that all of the pain seemed to be related to weight bearing and/or use [TR 650]. She had full strength in her upper and lower extremities [TR 650].  Dr. Joyce noted that Ivey has evidence of osteoarthritis, but he was most concerned with her left hip, which was significantly painful on a range of motion exam [TR 650]. This is what gave her the bulk of her problems with weight bearing and ambulating [TR 650].  His impression was that Ivey likely had osteoarthritis, left hip pain, right medial epicondylitis, obesity, chronic obstructive pulmonary disease, hypertension, and a history of cervical cancer [TR 650].  The tests that Dr. Joyce ordered revealed no significant joint space narrowing in her knees but a questionable small effusion on her right; mild soft tissue swelling surrounding her fifth proximal interphalangeal joint in her right hand; mild osteoarthritic changes in her hips, more so in the left hip than the right hip; and no evidence of fracture, no definite joint effusion, and no significant soft tissue swelling in her right ankle,

10

but a small plantar calcaneal spur was identified [TR 661].

In December 2008, Ivey returned for a reevaluation since her back fusion surgery, at which time she reported her pain as a 2 out of 10 and she complained of an occasional electrocuting pain in her lower left extremity approximately once per month [TR 643]. Her December 2008 x-rays were reviewed and looked excellent, she was to continue taking Neurontin [TR 643].

In February, March, and April of 2009, Ivey was examined in response to her complaints of anorexia, dizziness, headaches, dry mouth and new nearsightedness [TR 640-42, 680]. During this same time frame, Ivey reported avoiding stairs or walking at a fast pace and having a limited physical ability due to her arthritis in her hips [TR 670]. In reviewing Ivey's MRI and CT scan, Robert Naclerio, M.D. indicated that there clearly showed an abnormality in the sphenoid (or tumor of the sphenoid sinus) [TR 680, 693]. On April 30, 2009, Ivey underwent a bilateral endoscopic sphenoidotomies with the removal of some sinus tissue for a biopsy [693-94].

Another abdominal angiogram was performed in November 2009, yielding post-operative diagnoses of moderate peripheral vascular disease, atherosclerotic disease of the lower extremities, and claudication [696]. Also documented is Ivey's participation in outpatient physical therapy from October 7, 2009 to November 4, 2009 for her lower leg pain [TR 624]. Ivey was discharged from physical therapy on November 4, 2009, at which time she rated her pain at a 3 to 10, on a 0 to 10 scale, she reported her pain being constant and chronic (greater than 21 days), and she reported pain in her bilateral calves and pain in her feet [TR 624]. Ivey indicated that nothing relieves the pain, but walking, moving around, and rainy weather

11

aggravate it [TR 624].  Ivey ambulated with an antalgic gait with left decreased stance time secondary to hip pain [TR 625].

Chest x-rays taken in December 2009 due to a cough and emphysema revealed Ivey's heart size was within normal limits and her lungs were hyper-inflated due to her chronic obstructive pulmonary disease, but were clear [TR 699].

**B.     Hearing**

At the outset of the hearing, Plaintiff's attorney argued that due to Ivey's age, fifty-seven years old, and tenth grade education, that she should be found disabled as of August 20, 2004 because she met or equaled listings 1.04 or 4.12, and she was disabled pursuant to grid rule 201.02[4] [TR 33].  At this point, the ALJ asked for clarification on whether Ivey would be pursuing another amendment to the disability onset date, changing it to an earlier date of August 2004, or whether she was changing it to 2007, when she would be considered a person of advanced age[5] [TR 34-36]. Ivey chose to stay with an alleged onset date of February 2, 2005, and her attorney indicated it would be more appropriate to reference grid rules 201.09 through

---

[4]The medical vocational guidelines, commonly known as the grids, are tables which evaluate a claimant's ability to work by matching her age, education, and work experience with her work capability, 20 C.F.R. pt. 404, Subpt. P, Appendix 2. *See Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir. 1991).  However, the presence of other, non-exertional limitations, not factored into the grids, may preclude an ALJ from relying on the grids and require consultation with a VE when the non-exertional limitations "substantially reduce a range of work an individual can perform." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citation omitted). Specifically, grid rule 201.02 provides that in order to find transferability of skills to skilled sedentary work for individuals who are of limited education and advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work setting or the industry. 20 C.F.R. pt. 404, Subpt. P, Appendix 2.  Individuals approaching advanced age with no past work experience or who can no longer perform vocationally relevant past work and have no transferable skills ordinarily results in a disabled finding. *Id.*

[5]Had Ivey amended her disability onset date to her 55th birthday, then grid rule 201.02 would apply as of the amended onset date.

201.12[6] [TR 35-36].

     Ivey testified that she had a tenth grade education level and had not worked since August 20, 2004 [TR 190].  For the twenty-seven years prior to that time, Ivey worked as a Return Goods Technician for a lock company working on broken padlocks [TR 59-61, 185-86].

     As for her medical ailments, Ivey's attorney summarized her medical ailments, and Ivey testified as to the same, indicating that she had a herniated lumbar disc, degenerative disc disease,[7] radiculitis,[8] peripheral vascular disease[9] with claudication,[10] left hip and right knee degenerative joint disease,[11] obesity, respiratory problems that include chronic obstructive pulmonary disease[12] and emphysema,[13] restless leg syndrome[14] and finally, sensation abnormalities in her lower extremities [TR 33, 39-41, 45-48, 54].  Ivey stated that she had leg and back pain, shortness of breath, and problems with her knees and hips; further, she testified

---

[6]Grid rules 201.09-201.12 are applicable to those who are closely approaching advanced age (50 to 54 years old) and limited to sedentary work. 20 C.F.R. pt. 404, Subpt. P, Appendix 2.

[7]*See* DE 20 at 2 (a condition in which pain is caused from a damaged disc).

[8]*Id.* (inflammation of the root of a spinal nerve).

[9]*Id.* (thickening or blocking of the arteries almost always in the lower extremities that causes a deficiency of blood).

[10]*Id.* (caused by peripheral artery disease and is a painful, aching, cramping, uncomfortable, or tired feeling in the legs that occurs during walking and is relieved by rest).

[11]*Id.* (a chronic joint disease with symptoms including pain that may be triggered or exacerbated by activity, stiffness, and occasional joint swelling; pain is usually worsened by weight and relieved by rest but can become constant).

[12]*Id.* (an airflow limitation that increases the work of breathing; symptoms include shortness of breath and coughing).

[13]*Id.* (a destruction of the lung that increases the tendency for airflow collapse and leads to lung over inflation, airflow limitation and air trapping).

[14]*Id.* (abnormal motions and sometimes sensations of the legs that may interfere with sleep).

that she could not do heavy lifting, could not sit or stand for very long [TR 39-42, 45].  Ivey
testified that she is in constant pain, and rated her back pain at a level of 7.5 on a scale of 1 to 10
and also stated that her leg pain was throbbing, and that it was at an 8 at the time of the hearing
[TR 41, 44-45].  To alleviate the pain she lays down, walks a little bit, and takes Neurontin
which causes her to have a headache, stomachs, and the shakes [TR 42-43, 45].  She also went
through physical therapy after her back surgery in June 2008 [TR 43-44].  She testified that she
has trouble breathing, uses inhalers, and has difficulty around smoke, strong odors, or fumes [TR
46-47].  Her left hip and right knee feel like they are going out of place when she walks causing
pain [TR 47-48].  Ivey indicated that she has a chair next to the stove so she can stand or sit
while cooking, and that her husband does most of the household chores [TR 49].  She thought
she could lift only 10 pounds and sit or stand for 15 minutes at a time [TR 51].

The Vocational Expert, Gianforte, testified that a lock repairer as its typically performed
in the national economy is light work and an SVP of 4, the high end of semi-skilled, and that
Ivey performed it at the medium level [TR 61-62].  The VE noted that as a lock repairer, the job
requires "a good deal of body English" [TR 69].  The VE further testified,  "You're bending over
the parts, you're using your upper extremities, and you're in pretty continuous motion while
you're doing the repairs and handling tools . . ." [TR 69].

The ALJ posed the following hypothetical to the VE:  [A] person of Claimant's age,
education, and work experience's skill set, who's limited to light exertional demands of work,
and who can never climb ladders, ropes, or scaffolds, and never crawl; but who can occasionally
climb ramps or stairs, balance, stoop, crouch, and kneel; and who must avoid concentrated
exposure to temperature extremes, wetness, or humidity, and environmental irritants such as

14

fumes, odors, dusts, and gasses.  Can such an individual perform Claimant's past work? [TR 64].

To which the VE responded that there was nothing in *this profile* that would suggest the person would not be able to do the past relevant work as a lock repair technician [TR 64] (emphasis added).  Thus, the VE testified that based on the ALJ's hypothetical question, Ivey was able to perform her past relevant work as it is generally performed in the national economy, and she identified the Dictionary of Occupational Title code as 49-9094.00[15] which refers to repairing locks but also involves the work of a locksmith [TR 63-69]. Because Ivey only worked on padlocks, she was not performing the broader tasks of a locksmith [TR 65-69]. The VE also testified that at the sedentary level there was no transferable skills [TR 65, 69].

Ultimately, the ALJ agreed with the VE and found that Ivey could perform her past relevant work as a lock repairer [TR 16, 22].

### III.  STANDARD OF REVIEW

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's finding of fact and

---

[15]The DOT's updated format is referred to as O*Net. *See* U.S. Department of Labor, Employment & Training Administration, by the National Center for O*Net Development, http://www.onetonline.org/ (last visited February 29, 2012).  In the O*Net database, "job zones" were developed to transition away from the DOT's specific vocational preparation measure ("SVP", or the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the abilities needed for average performance in a specific work situation). *Id*. Specifically, 49-9094.00 is the O*Net code for "Locksmiths and Safe Repairers" which refers to an occupation involving the repair and opening of locks, making keys, changing locks and safe combinations, and installing and repairing safes, and, it lists a sample of reported job titles which includes the following: locksmith, lock technician, certified master locksmith (CML), service technician, certified master safecracker (CMS), forensic locksmith, road service locksmith, safe technician, certified master technician (CMST), and certified registered locksmith (CRL). *See* U.S. Department of Labor, Employment & Training Administration, by the National Center for O*Net Development, http://www.onetonline.org/link/summary/49-9094.00 (last visited February 29, 2012).  Occupations coded at 49-9094.00 have an SVP range of 4.0 to 6.0 and a job zone of 2, meaning that these occupations usually require a high school diploma, some previous work-related skill, knowledge, or experience, and often involve using knowledge and skill to help others. *Id*.

denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial

16

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4) (i)-(v). The steps are to be evaluated in the following order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a medically severe impairment; (3) whether the claimant's impairment meets or equals one listed in the regulations; (4) whether the claimant can still perform relevant past work; and (5) whether the claimant can perform other work in the community. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v.*

17

*Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## IV.  DISCUSSION

Ivey has raised various issues with the findings and conclusions of the ALJ: (A) that the ALJ's apparent offer to issue a partially favorable decision if Ivey agreed to terminate any further action warrants remand; (B) that the ALJ's credibility determination of Ivey is contrary to agency policy and case law; (C) that the ALJ's RFC finding lacks requisite record support; and (D) that the ALJ failed to properly assess Ivey's ability to perform her past relevant work.

The Court finds no error based on the ALJ's handling of the hearing.  However, because the Court finds that the ALJ's RFC determination lacks the requisite evidentiary support in order to build a logical bridge from the evidence to his assessment of the work-related activities that Ivey is able to perform on a regular and continued basis despite her limitations, this case requires a remand.  In light of the remand, the Court need not address Ivey's argument concerning the ALJ's credibility determination.

## A.      The Interaction between the ALJ and Plaintiff's Attorney

Ivey was born in October 1952 and alleged a disability onset date of February 2, 2005, when Ivey was fifty-two years old.  At the time of the hearing Ivey was fifty-seven years old.  In his opening remarks, Ivey's counsel, Mr. Thomas J. Scully III, argued that Ivey should be found disabled pursuant to grid rule 201.02.  Yet as previously detailed, grid rule 201.02 applies to an individual of advanced age, fifty-five years old or older. *See supra* footnote 4.  Thus, unless Ivey amended her alleged disability onset date to October 2007, then she would not automatically fall under the scope of 201.02 at the time she alleged to have become disabled.  *See* 20 C.F.R. pt. 404, Subpt. P, Appendix 2; *but see* 20 C.F.R. § 404.1563(b) (noting that the age categories are

not to apply mechanically in a borderline situation).

Noting the inherent problem with Scully's argument, the ALJ sought clarification from Ivey's counsel by stating: "you cited, cited rule 201.02(a). An individual at 201.02 would be at an advanced age? Is that correct?" [TR 35]. Scully responded in the affirmative. Therefore, the ALJ then asked if Ivey would be seeking an amendment of the alleged disability onset date to October 2007. *Id.* The ALJ indicated that such an amendment would expedite matters. *Id.*

Ivey contends that the ALJ's suggestion of an expedited hearing was akin to the ALJ's offering to issue Ivey a partially favorable decision at the time of her 55th birthday, in exchange for Ivey's withdrawing her claim relative to the time frame between 2005 and 2007 [DE 20 at 10]. In other words, Ivey contends that the ALJ was advocating that she drop a portion of her claim and her right to a hearing, in exchange for a partially favorable decision. *Id.* at 11. Ivey advances the argument that such a colloquy implies an impermissible *quid pro quo* on the part of the ALJ by relying on *Nelms v. Astrue*, 553 F.3d 1093, 1100 (7th Cir. 2009) (Ripple, J., concurring).

In response, the Commissioner argues that Ivey has misrepresented the statements made at the hearing [DE 22 at 6-7]. The Court agrees with the Commissioner.

After a careful reading of the transcript,[16] it is clear that the confusion was caused by

---

[16]The conversation between Scully and the ALJ went as follows:
ATTY: The alleged onset date is August 20, 2004 . . . we are looking at the applicable listing 1.04 or 4.12, and the GRID rule 201.02 . . . .

ALJ: You mentioned two things . . . and I want clarification. You said you're pursuing an allegation of onset on August 28, 2004, while at time, time she applied, she alleged she became unable to work February of 2005? Is that correct?

ATTY: Well, then, I misread it . . . . That's no problem. 2/2/05 is good, Judge.

ALJ: And you cited, cited rule 201.02(a). An individual at 201.02 would be at an advance age? Is

Scully's proposing that Ivey should be found disabled under grid rule 201.02, which would only apply automatically at the time Ivey turned 55 years old.  As a result, the ALJ needed to determine which theory Scully was advancing, including the possibility of Ivey's amending her onset date.  Notably, there is nothing unusual about amending the onset date of disability during the administrative hearing.  *See, e.g., Williams-Overstreet v. Astrue,* 364 Fed.Appx. 271, 273 (7th Cir. Feb. 8, 2010) (unpublished opinion); *Begley v. Astrue*, 3:10-cv-73-RM, 2011 WL 1045844 *1 (N.D. Ind. Mar. 16, 2011); *Ramsey v. Astrue*, 1:09-cv-233-JVB, 2010 WL 3273058 *1 (N.D. Ind. Aug. 18, 2010); *Fenker v. Astrue*, 1:08-cv-231-TS, 2010 WL 406061 *1 (N.D. Ind. Jan. 25, 2010); *see also Butzen v. Astrue*, 10-C-7941, 2011 WL 3898036 *5 (N.D. Ill. Sept. 6, 2011) (finding that the ALJ erred when he failed to advise the *pro se* claimant that she could

---

that correct?

ATTY: Yes, she's 57.

ALJ: Right.  Well, will you be pursuing another amendment of allegation at this point, that, you know, if I were [sic] find that she's disabled as of the time she obtains advanced age?

ATTY: Well, I try to go down as early as possible, but I'm always open to, you know, open to compromise, depending - -

ALJ: But you - - if, if we were to have this discussion - - I mean, obviously, we could, we could expedite matters if we - - you know, if you, you agree that the evidence shows certain - - you know, that in totality, obviously, it's certain that she's capable of performing a certain range of work, the attained age - - she obtains advanced age - -

ATTY: Right, right.  Well, I think that she was limited to sedentary as soon as she had her operation, Judge, to tell you the truth.

ALJ: Okay.  Do you want to, do you want to have another discussion with your client as to what you think is appropriate, what the evidence shows that would support that?  I mean - - or would make such a finding?

ATTY: You mean, whether or not she's agreeable to going with 2007?

ALJ: Yes, sir.

[TR 33–36].

amend her onset date during the hearing).

Moreover, Ivey's position is not supported by the concurring opinion in *Nelms v. Astrue*, wherein Judge Ripple stated, "An ALJ must be very circumspect, and even-handed, in his advice to a litigant and, here, [the claimant] may well have interpreted the ALJ's advice as expressing the ALJ's personal view that no attorney was needed." 553 F.3d at 1100. In *Nelms*, Judge Ripple wrote separately to "underline the inherent unfairness in the ALJ's having assured [the claimant] that the judge had an independent responsibility to develop the record and then leaving such a wide gap in the development of the relevant medical history." *Id*. Importantly, the claimant in *Nelms* proceeded *pro se* during the administrative hearing with the ALJ; whereas, in this case, Ivey was represented by counsel. Thus, any risk that the ALJ was trying to induce Ivey to drop a portion of her claim, is alleviated by the fact that Ivey had an attorney representing her to make legal decisions about how the case should proceed. Further, unlike the situation in *Nelms,* where Nelms could have interpreted the ALJ's advice as expressing the view that no attorney was needed, in this case, there is nothing improper with the ALJ's suggesting that the case would be expedited by amending the onset date to a date two years down the road—of course, such an amendment would decrease the relevant time frame needing to be considered for purposes of disability. Most importantly, at no time did the ALJ ever offer to give Ivey a favorable decision, if she would simply amend her onset date. Such an interpretation is clearly an exaggeration when the ALJ's statements are read in context. Accordingly, the Court finds that Ivey's argument that the ALJ acted improperly is without merit.

**B.**     **Residual Functional Capacity**

Next, Ivey argues that the ALJ's RFC determination lacks requisite record support [DE

20].

The ALJ must determine the claimant's RFC before performing steps four or five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id*. This finding must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a). The ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability, *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), and he is

required to determine which treating and examining doctors opinions should receive weight and must explain the reasons for these findings. 20 C.F.R. §§ 404.1527(d), (f).

Ivey maintains that Dr. Wenzler, the non-examining state agency medical consultant who reviewed Ivey's file on June 27, 2008 [TR 572-79], conducted a review of her record prior to the submission of critical evidence. Ivey argues that the additional evidence not reviewed by Dr. Wenzler undercut Dr. Wenzler's conclusions about the severity of her existing conditions. Thus, Ivey contends that the ALJ's significant reliance on Dr. Wenzler's RFC determination that Ivey is able to perform work at the light level,[17] is reversible error.

The Commissioner argues that Dr. Wenzler had "the bulk of the medical evidence" before him when he gave his opinion and correctly points out that Ivey's back surgery on June 11, 2008, occurred prior to Dr. Wenzler's review of the record on June 27, 2008 [DE 22 at 8]. However, the Commissioner does not address the critical fact that the medical records from the surgery were not received until August 6, 2008, well after Dr. Wenzler's review, and, that Dr. Wenzler did not mention her back surgery, but explicitly noted (in formulating his opinion that Ivey embellished her back pain) that Ivey did not take narcotic pain medication and had no pain clinic visits.

In *Staggs*, the district court was faced with a similar situation where the ALJ determined that the claimant did not meet a listing for purposes of being found disabled, but the expert medical testimony consisted of two state agency physicians who rendered their opinions without considering the claimant's entire medical record. *Staggs v. Astrue*, 781 F.Supp.2d 790, 794-95

---

[17]The ALJ stated, "I find that this assessment [of Dr. Wenzler] is very reasonable given the medical evidence available *at the time* of the evaluation, and therefore I give it significant weight in determining the claimant's residual functional capacity." [TR 20] (emphasis added).

(S.D. Ind. 2011).  Specifically, the state agency physicians rendered their opinions before

considering the October 31, 2008 St. Francis Hospital physical therapy evaluation which

characterized the claimant's back pain as "chronic," noted that "her flexion, extension and

rotation were limited by pain . . . that . . . went down her right leg," and noted that the claimant's

"side bending was limited by pain," "[s]he had spasms in her hamstrings," "weakness in her legs

and in her abdomen," a "positive straight leg raise test," and "a leg length discrepancy." *Id.* at

796.  The court found that the medical record (omitted from review) provided "significant

substantive evidence" regarding the claimant's medical impairments and that any medical

opinion rendered without taking this subsequent record into consideration was "incomplete and

ineffective." *Id.* at 795.  Therefore, the court remanded the case with instructions to obtain and

consider an updated medical opinion based on all of the evidence in the record. *Id.*

Similar to *Staggs*, the state agency physician who reviewed Ivey's medical records, Dr.

Wenzler, did not have Ivey's entire medical record before him when he rendered his opinion on

June 27, 2008.  Ivey's back surgery occurred on June 11, 2008, however, these medical records

were not received by the Commissioner until August 6, 2008—after Dr. Wenzler's review.

Moreover, it is clear that Dr. Wenzler's opinion for finding Ivey's complaints of back pain only

partially credible, was based on Ivey's conservative treatment—when in fact, she had just

received an anterior lumbar fusion at L5-S1, of which Dr. Wenzler was unaware.

Dr. Wenzler was also unfamiliar with Ivey's followup physical therapy and the resulting

records which indicated that in July 2008, Ivey could only sit for 15 minutes, stand for 5-10

minutes, and walk one-half block.  The physical therapist instructed Ivey that she needed to take

rest periods.  Also in July, Ivey's pain was reported as being as high as an 8 out of 10.  Even

when Ivey was discharged from therapy at the end of July, she could still only sit for 10 minutes, stand for 15-20 minutes in one place, and walk around for 15 minutes. Ivey's September records indicated that Ivey was doing much better after her surgery, but she reported that she was experiencing pain in her hands, knees, left hip, and right ankle, and that Tylenol and Ibuprofen were not working. Dr. Joyce opined that Ivey's pain seemed related to her weight bearing and/or use. In addition, in December 2008, Ivey reported that her pain was only a 2 out of 10, but she complained of an occasional electrocuting pain in her lower left extremity. Almost a year later, Ivey went back to physical therapy in October 2009 for her lower leg pain. Her November 2009 physical therapy discharge records indicate that she rated her pain as a 3, but she reported that her pain was constant and chronic (greater than 21 days), she had pain in her calves and feet, and that nothing relieved the pain. Ivey reported that walking, moving around, and rainy weather aggravated her pain, and it was documented that she ambulated with an antalgic gait with a left decreased stance time secondary to hip pain. Lastly, Ivey's peripheral vascular disease was reported as mild in June 2007 and May 2008, when Dr. Wenzler reviewed her records; however, diagnostic tests in November 2009 showed moderate peripheral vascular disease.

Similar to the holding in *Staggs*, while it is true that the ALJ is entitled to rely on a reviewing state agency's medical opinion, 20 C.F.R. § 404.1527(f), the ALJ's decision to give Dr. Wenzler's opinion "significant weight in determining [Ivey's] residual functional capacity" is a decision that cannot stand where it lacks evidentiary support and is based on an inadequate review of Ivey's subsequent medical record (as detailed). SSR 96-6p ("the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record,

considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist"). Ivey's post-June 1, 2008 medical records provide significant substantive evidence regarding her medical impairments, and any medical opinion rendered without taking this subsequent record evidence into consideration is incomplete, ineffective, and simply not supported by substantial evidence. *Id.*; *see* 20 C.F.R. § 404.1520(e) (stating that the claimant's RFC is to be based on "all the relevant medical and other evidence in [the claimant's] case record.")

The Court recognizes that the ALJ mentioned that Dr. Wenzler's opinion was rendered based on the medical evidence "available at the time of [his] evaluation." (Tr. 20). However, what is problematic is that despite giving Dr. Wenzler's opinion "significant weight in determining the claimant's residual functional capacity," the ALJ failed to *explain* why the omission of Ivey's subsequent medical records from Dr. Wenzler's review made no difference in the RFC assessment. Although the ALJ summarized many of Ivey's post-June 1, 2008 medical records in his opinion, the ALJ did not discuss the discrepancies between those records and Dr. Wenzler's opinion, nor did the ALJ indicate why he chose to give more weight to Dr. Wenzler's opinion which was contradicted by the later records.

In particular, after relying on Dr. Wenzler's opinion to determine Ivey's RFC, any logical bridge is lacking between the evidence and the ALJ's conclusions relative to Ivey's being capable of performing light work without further restrictions. Light work requires lifting up to

20 pounds and frequent lifting of objects weighing up to 10 pounds and "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In fact, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83–10.

Yet, Ivey's records would indicate that she may be further limited in her ability to stand, walk, and sit. For instance, aside from Dr. Makam's June 2007 opinion that Ivey can barely walk half a block without getting calf claudication (which the ALJ discounted as Dr. Makam's having relied too heavily on Ivey's subjective complaints), physical therapy notes from July 2008 indicated that Ivey could only sit for 15 minutes, stand for 5-10 minutes, and walk one-half block, the importance of rest periods was reinforced, and Ivey's pain was reported as ranging from 1-8 out of 10 during July; and, as of July 28, Ivey could sit for 10 minutes, stand for 15-20 minutes in one place, and walk around for 15 minutes. These documents were generated only a month after Dr. Wenzler's opinion was provided, and although the ALJ refers to these same documents in his opinion [Tr. 20], he does not point out or ever discuss Ivey's walk/stand/sit limitations. In addition, in September 2008, Dr. Joyce indicated that Ivey's pain seemed to be related to weight bearing and/or use, and; in November 2009, Ivey's physical therapy records indicated that Ivey ambulated with an antalgic gait with left decreased stance time secondary to hip pain. Yet, again, while the ALJ refers to these records, he does not discuss how these medical records, or how any evidence in the record (other than Dr. Wenzler's unsupported opinion) would support Ivey's being able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday.

Furthermore, the decision of the ALJ never discussed Ivey's upper extremity limitations.

Specifically, Ivey's medical records indicate that in March 2008, she experienced elbow pain and hand cramping and numbness, and nerve conduction studies indicated that she had mild left carpal tunnel syndrome in her left hand and lateral epicondylitis bilaterally.  In Ivey's August 2008 physical therapy sessions, she reported hand stiffness after about twenty minutes of activity, and in September 2008, Ivey was experiencing pain in her hands, and she was found to have mild soft tissue swelling surrounding her fifth proximal interphalangeal joint in her right hand.  Despite these medical records evidencing diagnosed upper extremity limitations, the ALJ did not indicate whether he accepted these diagnoses, whether Ivey's documented hand/elbow issues affected her physical ability and work limitations, or how the limitations were accounted for in the ALJ's RFC assessment.  However, the ALJ is "not free to dismiss [Ivey's] hand impairment without explaining why he reached that conclusion 'in a manner sufficient to permit an informed review.'" *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994) (admitting that the objective medical evidence relevant to the claimant's hand impairment was "very sparse" but it was supported by the medical evidence and needed to be explained by the ALJ) (citations omitted).

The Court realizes that an ALJ need not discuss every piece of evidence in the record, so long as he builds a logical bridge from the evidence to his conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding). However, in this case, the ALJ has not bridged the gap between the evidence and his RFC determination.

28

Ivey has a host of significant medical conditions, as discussed, and having found that one or more of her impairments was "severe," the ALJ needed to consider the aggregate effect of this entire constellation of ailments—including those impairments that in isolation are not severe. *See Denton*, 596 F.3d at 423. Although the ALJ referred to Ivey's documented medical history, the ALJ did not explain how all of Ivey's limitations, including non-severe impairments, were accounted for in the RFC assessment. Because the ALJ's RFC finding lacks an adequate discussion of the relevant medical evidence and is not supported by substantial evidence, remand is appropriate. With this finding of error, the Court need not separately address whether the ALJ properly considered any additional limitations posed by Ivey's obesity in formulating the RFC, nor does the Court need to decide whether the ALJ's credibility determination was in error.

### C.      Steps Four and Five

On remand, after reevaluating the RFC determination, the ALJ must decide what, if any, employment Ivey is capable of performing. 20 C.F.R. § 404.1520(f). The task necessarily entails a comparison of the demands and requirements of the claimant's past relevant work with her present mental and physical capacity. *Bauzo v. Bowen*, 803 F.2d 917, 925 (7th Cir. 1986). Additionally, to establish that the claimant is able to return to her past relevant work, the record must establish that she could do so on a sustained basis. *See Veal v. Bowen*, 833 F.2d 693, 697 (7th Cir. 1987).

The ALJ found that Ivey was not disabled because she is able to do her past relevant work as a lock repairer, as it is performed in the national economy, and the ALJ relied on the VE's testimony in making his conclusion. However, the VE testified that the job of a lock repairer requires "a good deal of body English." [TR 69]. "You're bending over the parts,

29

you're using your upper extremities, and you're in pretty continuous motion while you're doing the repairs and handling tools . . . ." *Id.*  In addition, Ivey testified that her work as a lock repairer required her to document her work on a computer [TR 61] and that she used a screwdriver, a pair of pliers and more or less her hands to do the work [TR 62].

However, because the ALJ did not properly calculate Ivey's RFC, the Court has no way of knowing if Ivey could actually perform the functional demands and job duties of her past occupation, either as actually performed or as generally required by employers throughout the national economy. *Orlando v. Heckler,* 776 F.2d 209, 215-16 (7th Cir. 1985) (citing SSR 82-61); *see Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008) (the ALJ need not conclude that the claimant is capable of returning to the precise job she used to have; it is enough that the claimant can perform jobs substantially like that one).

Accordingly, on remand, the ALJ must reevaluate whether Ivey is capable of performing her past work. *See* SSR 86-8 (noting that the decision as to whether the claimant retains the functional capacity to perform her past work "has far-reaching implications and should be developed and explained fully in the disability determination . . . [s]ince this is an important and, in some instances, a controlling issue, every effort should be made to secure evidence that resolves the issue clearly and explicitly.").  Notably, this is not a case where the Court can impute knowledge of Ivey's limitations to the VE, because the VE only answered the particular hypotheticals posed to the VE by the ALJ, which was based on an RFC that was not adequately supported. *See Young*, 362 F.3d at 1003-05 ("When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the

limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can [perform past work or] adjust to other work in the economy cannot stand.").

If Ivey cannot perform her past work, the question becomes whether she has the capability of performing other work in the national economy. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir. 1985); 20 C.F.R. § 404.1520(g). As to Ivey's ability to perform other work in the national economy, substantial evidence in the record must support such a finding. *Tom*, 779 F.2d at 1254. The ALJ must properly assess Ivey's RFC, incorporating all of the relevant limitations from which she suffers, then determine whether she is capable of performing work. At the end of the day, the Commissioner bears the burden at step five, not Ivey, and any hypothetical ultimately posed to a vocational expert "must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009).

In light of the fact that the ALJ's RFC determination is not supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, the ALJ's determination that Ivey is not disabled must be reconsidered. The record does not command a determination that Ivey should be awarded benefits, but the ALJ has not adequately supported his conclusions.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Ivey's motion to remand the ALJ's decision. [DE 1]. Accordingly, the Court now **REMANDS** this case for further consideration by the Commissioner, consistent with the conclusions in this Opinion and Order.

SO ORDERED.

ENTERED:   March 20, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

31